Eleanor F. **WILSON**, Richard F. Wilson, P.D. Chadderdon, Clinton E. Nelson, Virginia E. Nelson, Kathryn A. Kennedy, William Michael Kennedy, Mark R. Francis, C. Laverne Gangwish, and Toni A. Dodge, Plaintiffs,

v.

AMOCO CORPORATION, an Indiana corporation, Amoco Oil Company, a Maryland corporation, Burlington Northern Railroad Company, a Delaware corporation, and Steiner Corporation, a Nevada corporation, Defendants.

No. 96–CV–0124–B.

United States District Court, D. Wyoming.

May 21, 1998.

982

Robert T. McAllister, Denver, Colorado, J.N. Murdock, Casper, Wyoming, for plaintiffs.

Frank D. Neville, Casper, Wyoming, Raymond W. Martin, Cheyenne, WY, Peter Billings, Salt Lake City, UT, Gary E. Parish, R. Daniel Scheid, Denver, CO, Thomas F. Ryan, Chicago, IL, for defendants.

## ORDER ON MOTION FOR SUMMARY JUDGMENT & MOTION FOR INTERVENTION

BRIMMER, District Judge.

### Background

Currently before the Court are the dispositive motions of Defendant Amoco. The facts of this case are set forth at length in the Court's previous order on Plaintiffs' Motion for Preliminary Injunction. *See Wilson v. Amoco Corp.*, 989 F.Supp. 1159 (D.Wyo. 1998). The Court therefore will not recount the facts in any detail here. Suffice it to say that Plaintiffs allege Defendant Amoco has discharged and released hazardous and toxic contaminants from its Casper, Wyoming facilities, and in doing so has injured the public health and the environment as well as Plaintiffs' properties. Plaintiffs bring claims under the citizen suit provisions of the Resource Conservation and Recovery Act (RCRA) and the Clean Water Act (CWA), and common law claims of trespass, nuisance, negligence, strict liability, and indirect condemnation.

### Standards of Review

#### 1. Summary Judgment

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact

is material if it might affect the outcome of the suit; an issue of material fact is genuine if a reasonable jury could return a verdict for the party opposing summary judgment. *See Walker v. Toolpushers Supply Co.,* 955 F.Supp. 1377 (D.Wyo.1997). In determining whether to grant summary judgment, the Court must examine the factual record in the light most favorable to the nonmoving party. *See Thomas v. IBM,* 48 F.3d 478, 484 (10th Cir.1995).

### Analysis

**1. Previously Considered Issues**

In a prior order, this Court dismissed the CWA claims against Steiner and Burlington Northern and the indirect condemnation claim against Burlington Northern. The reasoning expressed in that order is equally applicable here, and warrants dismissal of the CWA and indirect condemnation claims against Amoco. The Court therefore enters summary judgment in favor of Amoco on those claims without further elaboration.

In that same order, the Court denied BN's and Steiner's motions for summary judgment on Plaintiffs' trespass, nuisance, and negligence claims. Except as noted below, the Court considers denial of Amoco's summary judgment on these claims appropriate as well.

**2. Statute of Limitations**

■■■■ Amoco contends that the applicable statute of limitations has expired with respect to the remaining state law claims of Chadderdon, Francis, and the Wilsons. The parties agree that the statute of limitations requires these claims to be brought within four years of their accrual. *See* W.S. § 1-3-105(a)(iv). A cause of action accrues when the injured party knows or reasonably ought to know that some damage has resulted from the wrongful act. *See Ogle v. Caterpillar Tractor Co.,* 716 P.2d 334, 337 (Wyo.1986).

The record before the Court indicates at least a few of the parties either knew or reasonably should have known before June 10, 1992—in some cases more than a decade before that date—of contamination of the respective Plaintiff's property and the source of that contamination. For example, Plaintiff Chadderdon testified unambiguously in his deposition that a 1978 inspection of his property revealed oil contamination. Chadderdon testified that "[T]he only assumption you could make would be—most likely assumption you could make, it came from Amoco." Deposition of Phillip Dennis Chadderdon, at 39–46. (Amoco Ex. G). Plaintiff Francis noticed a petroleum sheen in water used on his property in either late 1990 or in 1991. Because of his rightful distrust of the water quality, Francis as early as 1991 advised his employees not to drink the tap water at his property; to discourage them from doing so, he purchased and used two distillers. Francis assumed the contamination was from the Amoco Refinery. *See* Deposition of Mark R. Francis, at 37–38, 85–91 (Amoco Ex. H). As early as the mid–1970s, Plaintiff Eleanor Wilson was aware of both oil seepage and the presence of an Amoco "skimmer" well on her property. Wilson further acknowledged a 1984 letter written to her husband by Amoco requesting permission to place a monitoring well on the Wilson property. *See* Deposition of Eleanor Wilson, at 23–29 (Amoco Ex. E). Eleanor Wilson's son, Plaintiff Richard Wilson, confirmed in his deposition that in late 1991 Eleanor Wilson hired Walter Merschat to perform studies of her property. Merschat informed the Wilsons within a month or two of his February 1992 report that contamination most likely emanating from Amoco's facilities had been found on the Wilson property. *See* Deposition of Richard Wilson, at 46–59 (Amoco Ex. H). These facts illustrate these Plaintiffs' knowledge of the presence and source of the contamination on their property before June 10, 1992.

Contrary to Amoco's assertions, however, Plaintiff's knowledge does not warrant outright dismissal of their state law claims, but merely a limitation on the period of time for which they may recover damages. This is so because Amoco's conduct, like Steiner's and BN's, consists not of a single episodic release of contamination from its facility into the environment, but of recurring and most likely continuous releases of contaminants from various parts of its facility, each of which in turn constitutes a separate and distinct tortious act and triggers the inception of a new

limitations period. Indeed, it appears likely that contamination from Amoco's former refinery and tank farm continues to migrate towards and impact these Plaintiffs' properties. Thus, the injury is not simply the result of a continuing tort, but also of an entirely new tortious act.

The Wyoming Supreme Court implicitly recognized this maxim in *Taylor Ditch Co. v. Carey*, 520 P.2d 218 (Wyo.1974). The plaintiffs there brought suit against Taylor for damages caused to their house by seepage from the bank of an irrigation canal owned and operated by Taylor. *See id.* at 220. Taylor objected to the suit on statute of limitations grounds, arguing that because the canal had been in operation—and seeping—since at least 1963, plaintiffs' cause of action necessarily accrued long before 1967, four years before the complaint was filed. *See id.* at 226–27. The Wyoming Supreme Court disagreed, noting that "if the seepage began to do damage in 1963 it would appear much more reasonable to conclude that the house was not immediately ruined but that as the seepage continued the damage to the house increased." *Id.* Based on this assumption, the court noted that all damages were allowable to the extent they were based on damage that had accrued within the previous four years, i.e., the limitations period. *See id.* at 227.

The court also recognized that the initial impact of later released (or perhaps just slower migrating) water on the plaintiffs' properties constituted a separate and distinct cause of action. In discussing the appropriateness of an injunction, the court noted that in the absence of injunctive relief the ditch company "could proceed year after year to permit the ditch to seep, gradually destroying plaintiffs' property, rendering it completely unsalable and leaving plaintiffs to an annual or quadrennial action to recover damages." *Id.* Had the court considered the seepage to be only a single—or noncontinuing—tort then only one action could have been brought. Thus, the court's ponderance of "annual or quadrennial" actions for the

impact of "new" seepage against Taylor dispels any notion that continuous impacts from continuous releases of contamination are not distinct torts which trigger a discrete limitations period. In any event, the Court here finds that Plaintiffs Chadderdon, Francis, and Wilsons, may recover for damage to their respective properties that occurred on or after June 10, 1992, four years before this suit was filed. *See In re Tutu Wells Contamination Litigation*, 909 F.Supp. 980, 988 (D.Vi.1995) (citing Cooke, The Law of Hazardous Waste: Management, Cleanup, Liability and Litigation, § 17.05[4][c], at 17–260) ("[A]ctions for temporary damages arising from recurrent emissions or migration of pollutants will accrue continuously.").[1]

### 3. Amoco Service Station

■ Amoco contends any contamination emanating from its service station (not its Refinery and Tank Farm) could not, given groundwater flow, have migrated in the direction of and impacted the properties owned by the Wilsons, Chadderdon, and Francis. In this respect, Amoco notes these Plaintiffs' properties are all located west and south of the service station property and that groundwater in the area indisputably flows north-northeast. The Court agrees that Amoco is entitled to summary judgment to the extent the Wilsons, Chadderdon, and Francis seek to recover on their state law claims for damages suffered as a result of contamination emanating from the service station. In dismissing the state law claims of these same Plaintiffs with respect to BN and Steiner, the Court noted as follows:

The Court agrees that these ... Plaintiffs have failed to produce evidence sufficient to create a genuine issue of material fact as to any of their common law claims. It is dispositive in this respect that the sole inference which may be drawn from the evidence before the Court is that, subject to slight variations, groundwater in the vicinity of the BN and Steiner facilities flows or migrates only in a north-northeast

1. The cases cited by Amoco are inapposite to this situation. Those cases involved one wrongful act which produced continuing effects on plaintiffs' properties. *See, e.g., Anderson v. Bauer*, 681 P.2d 1316, 1321 (Wyo.1984). As noted, the circumstances here entail recurring wrongful acts with recurring and continuing effects.

direction and affects only downgradient properties. Because these Plaintiffs' properties all lie upgradient, or west or southwest of the BN and Steiner facilities, any contamination of Plaintiffs' properties cannot be considered the consequence of the contamination emanating from the facilities of these two Defendants.

Order on Motions for Summary Judgment, at 7 (September 26, 1997).

The Amoco service station is located in close proximity to the BN and Steiner facilities. Thus, the reasoning of the Court's prior order dictates that no physical impact from the service station on these properties is possible, and thus no trespass claim sustainable. Furthermore, because there is no evidence of any damage suffered by these Plaintiffs, be it interference with use or enjoyment of the property, stigmatization, or loss of property value, resulting from any service station contamination, these Plaintiffs' nuisance and negligence claims are likewise dismissed with respect to the Amoco service station. The Court emphasizes, however, that this ruling in no way affects these Plaintiffs' trespass, nuisance, and negligence claims against Amoco arising out of the contamination stemming from the Refinery and Tank Farm.

■ Amoco does not dispute that the remaining, or "North Casper," Plaintiffs' properties are located downgradient of the former Amoco service station, but contends the North Casper Plaintiffs have submitted no evidence indicating any contamination from the service station has impacted their specific properties. While the Court agrees that the evidence offered by Plaintiffs in this regard in this regard is not compelling, the Court disagrees that the evidence is so flimsy as to warrant summary judgment. Plaintiffs' expert Benjamin Doty attests in his affidavit that the "soil underlying the Amoco gas station is contaminated with elevated BTEX and total petroleum hydrocarbons...." Investigations conclude that, although other upgradient sources may have contributed, on-site releases are a probable source of the significant groundwater contamination beneath the gas station. Affidavit of Benjamin P. Doty, at 4, ¶ 11 (Pls.Ex.3). Elsewhere in his affidavit Doty opines, "[I]t is evident that the [gas station] is a source of groundwater contamination and that the dissolved plume extends off-site." *Id.* at 5, ¶ 17(c). Furthermore, as the Court noted in its Order on Motion for Preliminary Injunction, 917 tons of contaminated soil were removed from the property in 1992; at that time, an inflow of groundwater exhibiting a "petroleum hydrocarbon sheen" was encountered. *See Wilson,* 989 F.Supp. at 1167.

### 4. Strict Liability

■ Plaintiffs claim Amoco is strictly liable for all harm caused by the release of contaminants from its facility. As Amoco notes in response, Wyoming does not impose strict liability on individuals engaging in abnormally dangerous activities, but instead adheres to the principle that the standard of care is always ordinary or reasonable care under the circumstances. As stated by the Wyoming Supreme Court:

> Wyoming [has] rejected the notion that absolute liability should be imposed for anything brought onto the land which was not naturally there, escaped and caused damaged. This court require[s] that negligence must be shown. We have ... consistently imposed the standard of ordinary care under all of the circumstances rather than absolute liability.

> •   •   •   •   •

> We believe the standard is correctly stated as ordinary or reasonable care but what constitutes ordinary care increases as the danger increases. The concept of ordinary care accommodates all circumstances so that the degree of care varies with the circumstances.

*Wyrulec Co. v. Schutt,* 866 P.2d 756, 761, 762 (Wyo.1993).

Thus, while the circumstances indicate Amoco may have been negligent in conducting its operations and handling various contaminants, evidence of such relates only to whether Amoco acted with reasonable care under the circumstances, not whether Amoco may be held strictly liable for engaging in an abnormally dangerous activity. Summary

judgment is therefore appropriate on the strict liability claim.

### 5. Stigmatization Damages

■ It is apparent from the maps submitted by Plaintiffs' damages experts that some Plaintiffs whose properties arguably have not been physically impacted or physically injured may nonetheless be seeking damages for the diminution in value of their properties allegedly caused by the stigma associated with living on or owning property that is in close proximity to property that has in fact been physically impacted or affected by contamination. Few courts, if any, have permitted recovery on the basis of stigmatization alone. In *Berry v. Armstrong Rubber Co.,* the Fifth Circuit Court of Appeals, applying Mississippi law, responded to plaintiffs' claim for stigma damages by noting that plaintiffs had "cited no case, and the court has found none, holding that Mississippi common law allows recovery for a decrease in property value caused by a public perception without accompanying physical harm to the property." 989 F.2d 822, 829 (1993). The Fifth Circuit reaffirmed this rule only recently in *Bradley v. Armstrong Rubber Co.,* 130 F.3d 168, 175–76 (1997) (allowing recovery for stigma damages where permanent and physical injury to plaintiff's property has occurred). The Third Circuit adopted a similar rule in the case of *In re Paoli R.R. Yard PCB Litig.,* holding there that stigma damages were recoverable only when a physical impact on the particular plaintiff's property had occurred. 35 F.3d 717, 798 (1994). Finally, both Michigan and California have rejected claims for stigma damages absent some proof of permanent physical injury. *See Adkins v. Thomas Solvent Co.,* 440 Mich. 293, 487 N.W.2d 715, 721 (Mich.1992); *Santa Fe Partnership v. ARCO Prods. Co.,* 46 Cal. App.4th 967, 983–84, 54 Cal.Rptr.2d 214 (Cal. App.1996). The Court agrees with the rational expressed in these and other cases that claims of stigma damages absent some other definable physical harm to the property are simply too speculative to warrant serious consideration. *See Adams v. Star Enter.,* 851 F.Supp. 770, 773 (E.D.Va.1994); *Chance v. BP Chems., Inc.,* 77 Ohio St.3d 17, 670 N.E.2d 985, 993 (1996). Consequently, Plaintiffs in the instant matter may not recover damages based solely on stigma absent proof of some physical injury or harm to the specific Plaintiff's property (i.e., separate establishment of a claim for trespass, nuisance, or negligence).

### 6. Intervention

■ On April 10, the Wyoming Department of Environmental Quality (WDEQ) filed a Motion for Intervention and a Proposed Intervenor's Complaint. The two bases of intervention are set forth in subsections (a) and (b) of Federal Rule of Civil Procedure 24. Subsection (a) authorizes intervention as of right upon timely application when either a federal statute confers an unconditional right of intervention or the applicant claims an interest in the subject transaction or property and is situated such that disposition of the action might impair or impede the proposed intervenor's ability to protect its interest. Subsection (b) provides for permissive intervention when a federal statute confers a conditional right to intervene or when an applicant's claim or defense and the main action have a question of law or fact in common. Subsection (b) further provides for intervention by an officer or agency "when a party to an action relies for ground of claim or defense upon any statute or executive order administered by a federal or state governmental officer or agency or upon any regulation, order, requirement, or agreement issued or made pursuant to the statute or executive order."

In this matter, WDEQ seeks to intervene solely to "participate directly in the fashioning of any corrective action remedy that may result from a finding of RCRA liability against Amoco." Memorandum in Support of Motion for Intervention, at 2. WDEQ asserts both that intervention as of right is appropriate pursuant to 42 U.S.C. § 6972(b)(2)(E) and that permissive intervention is appropriate because the action involves alleged violations of RCRA, a federal statute that WDEQ is federally authorized to implement in Wyoming. Because the Court considers intervention appropriate under both subsection (a) and (b), and because

Amoco does not object, the Court will grant WDEQ's intervention motion.

### Conclusion

Based on the foregoing, the Court **ORDERS** that the Motion for Summary Judgment of Defendant Amoco is **GRANTED IN PART AND DENIED IN PART**. Specifically, Amoco's Motion for Summary Judgment is **GRANTED** with respect to Plaintiffs' Clean Water Act, strict liability, and indirect condemnation claims, and **DENIED** with respect to Plaintiff's Resource Conservation Act, trespass, nuisance, and negligence claims. The Court further **ORDERS** that the Wyoming Department of Environmental Quality's Motion to Intervene is **GRANTED**.