[598 NYS2d 821]

In the Matter of Xɪox Cᴏʀᴘᴏʀᴀᴛɪᴏɴ, Appellant, et al., Petitioner, v Pᴜʙʟɪᴄ Sᴇʀᴠɪᴄᴇ Cᴏᴍᴍɪssɪᴏɴ ᴏꜰ ᴛʜᴇ Sᴛᴀᴛᴇ ᴏꜰ Nᴇᴡ Yᴏʀᴋ et al., Respondents.

Third Department, June 3, 1993

**APPEARANCES OF COUNSEL**

*Cohen, Dax, Koenig & Wiles, P. C.,* Albany *(John W. Dax* of counsel), for appellant.

*William J. Cowan,* Albany *(Jonathan D. Feinberg* of counsel), for Public Service Commission of the State of New York, respondent.

*Hiscock & Barclay,* Albany *(David E. Blabey* of counsel), and *Swidler & Berlin,* Washington, D.C., for Niagara Mohawk Power Corporation, respondent.

### OPINION OF THE COURT

YESAWICH JR., J.

The Federal Public Utility Regulatory Policies Act (hereinafter PURPA; *see,* 16 USC § 824a-3) and the Public Service Law *(see,* Public Service Law § 66-c) require public utility companies such as respondent Niagara Mohawk Power Corporation to purchase electricity from Federally qualified alternate energy producing facilities (hereinafter qualifying facilities). Respondent Public Service Commission (hereinafter PSC) is charged with overseeing the contracting process and is statutorily bound, by both Federal and State law, to ensure that the amounts paid under such contracts are "just and reasonable" to the end-consumer of electricity (16 USC § 824a-3 [b] [1]; Public Service Law § 66-c [1]).

Pursuant to this authority the PSC has, at various times, established policies to aid utilities and qualifying facility developers in negotiating these mandatory power purchase contracts. Notably, the PSC generated a series of estimated "long run avoided cost"[1] schedules (hereinafter LRACs) for use in determining appropriate purchase prices for long-term contracts. These LRACs were regularly brought up to date as projections changed due to shifts in technology and market factors. Aware that this updating process could present difficulties in deciding which LRAC schedule should be used in a particular contract, the PSC, in February 1991, established guidelines for application of LRACs to projects which were in various stages of negotiation when a revised LRAC schedule replaced a prior schedule *(see,* Pub Serv Commn Opinion and Order No. 91-2 [Feb. 25, 1991] [hereinafter Opinion 91-2]). In that circumstance, Opinion 91-2 essentially provides that if negotiations between a developer and a utility are substantially completed, the utility should permit the older schedule to be used; otherwise, the newer schedule will apply.

Petitioner Xiox Corporation (hereinafter petitioner),[2] an Oklahoma enterprise which proposes building two qualifying

---

1. Avoided costs are those costs a utility would incur to produce the energy itself had it not purchased the energy from the qualifying facility.

2. Polsky Energy Corporation, also a petitioner in this proceeding, has withdrawn its appeal.

facilities in Cattaraugus County, entered into negotiations with Niagara Mohawk for the purchase of the electricity to be generated by those facilities. In July 1991, petitioner forwarded to Niagara Mohawk two contracts—signed by a representative of petitioner—which embodied the resulting agreement and which were based on the then-current 1990 LRAC schedule. Niagara Mohawk did not execute the contracts, and on September 11, 1991 the PSC, having decided that they were glaringly incorrect, withdrew the 1990 LRACs.

Petitioner applied to the PSC for a declaratory ruling that it was entitled to execution of the contracts as they were written, incorporating the 1990 LRACs. The PSC agreed that petitioner had a right to have the contracts executed, but refused to bind Niagara Mohawk to the 1990 LRACs for those contracts. Instead, it found that petitioner is only entitled to a rate based on an accurate estimate of avoided costs at the time petitioner first established a "legally enforceable obligation" (hereinafter LEO), as that term is defined by the Federal Energy Regulatory Commission regulations implementing PURPA *(see,* 18 CFR 292.304 [d] [2]).

Thereafter, petitioner commenced this CPLR article 78 proceeding seeking partial annulment of the PSC's determination and enforcement of the contracts as they were initially negotiated based on the 1990 LRACs. Supreme Court confirmed the PSC's determination and petitioner appeals.

At the outset, it should be noted that petitioner is not contesting the PSC's decision to withdraw the 1990 LRACs, but rather argues that it acquired a vested right to those rates prior to their withdrawal and that the PSC is obliged to enforce that right by directing Niagara Mohawk to enter into the previously agreed-upon contracts which incorporate the withdrawn LRACs. We find no authority mandating the relief requested in the petition and, beyond that, we find that the PSC has adequately explained its decision not to order Niagara Mohawk to execute the contracts; accordingly, we affirm the judgment of Supreme Court.

The Federal law and implementing regulations accord a qualifying facility developer the prerogative of opting for a contract price based on a reasonable approximation of the LRACs at the time petitioner incurred the LEO *(see,* 18 CFR 292.304 [d] [2]). Here, the 1990 LRACs did not accurately reflect such costs; hence, the PSC rightly concluded that Federal law does not create any entitlement to the rates set

forth therein. Furthermore, State law requires only that the PSC compel an electric corporation like Niagara Mohawk to enter into a contract containing such terms "as the [PSC] shall find just and economically reasonable" to the utility's ratepayers (Public Service Law § 66-c [1]). Given that the PSC has found that the 1990 LRACs do not meet this standard, requiring it nonetheless to foist the contracts proposed by petitioner upon the utility cannot be countenanced for it would run counter to the PSC's statutory duty.

■ Petitioner, however, asserts that because Opinion 91-2 was an agency rule, duly promulgated in accordance with the State Administrative Procedure Act, and as such is binding on the agency, the PSC was constrained by this rule to require Niagara Mohawk to accept the use of the 1990 LRACs in petitioner's contracts. It is undisputed that when the contracts were forwarded to Niagara Mohawk, the proposal had reached the level of certainty beyond which Opinion 91-2 suggested that replacement of the 1990 LRACs need not be incorporated. This being the case, petitioner maintains it had at that time acquired a "vested right" to utilize the 1990 LRACs, and thus the PSC's failure to compel Niagara Mohawk to execute the contracts as written was an impermissible and unconstitutional retroactive abrogation of existing contract rights.

We are not persuaded. The portion of Opinion 91-2 relied upon by petitioner does not mandate any action on the part of the PSC, but simply sets out guidelines to assist the negotiating parties in formulating a reasonable contract in the face of changing LRACs. The opinion states that "utilities should not impose a new schedule on substantially completed negotiations *merely* because updated estimates were issued at an inconvenient time", but should, in that situation, "allow developers to conclude negotiations based on an existing schedule that has been replaced" if the proposed design and contract language are sufficiently complete (Opinion 91-2, at 8 [emphasis supplied]). Plainly, this language imposes no obligation upon the PSC to acquiesce in or to compel the execution of a contract whose rates are not "just and economically reasonable" to the consumer or are otherwise objectionable.

Furthermore, even if the portion of Opinion 91-2 relied upon by petitioner could be considered a binding rule, the PSC has concluded that it does not apply to the situation at hand, an interpretation that is not unreasonable given the language of the opinion, and which must therefore be upheld *(see, Matter of Indeck-Yerkes Energy Servs. v Public Serv. Commn.,*

164 AD2d 618, 623). When the section of Opinion 91-2 dealing with LRACs is read in its entirety, it is evident that it was intended to address the problem created by the ordinary, yearly replacement of LRACs and not the extraordinary predicament present here, where an LRAC schedule was withdrawn because it was found to be fatally flawed—the PSC misperceived the impact that the then-recent invasion of Kuwait would have on oil and gas prices—even for the time period during which it was intended to be in use.

Inasmuch as there is no law or regulation granting petitioner the right to use the 1990 LRACs once they had been withdrawn, the PSC's decision must be reviewed as a discretionary act. Given the PSC's finding that the 1990 LRACs were substantially overstated and inaccurate (a determination which has not been challenged by petitioner), coupled with its overarching duty to ensure that power purchase contracts meet the statutory requirement that rates be "just and reasonable" to ratepayers, we are not disposed to conclude that the PSC's decision to treat this situation differently from the routine LRAC replacements contemplated in Opinion 91-2, by refusing to permit the 1990 LRACs to be "grandfathered" into petitioner's contracts, was an abuse of discretion *(see, Matter of Long Is. Light. Co. v Public Serv. Commn.,* 137 AD2d 205, 212, *lv denied* 73 NY2d 703; *see also, Matter of Niagara Mohawk Power Corp. v Public Serv. Commn.,* 138 AD2d 63, 67, *lv denied* 73 NY2d 702).

WEISS, P. J., CREW III, MAHONEY and HARVEY, JJ., concur.

Ordered that the judgment is affirmed, without costs.